```
IN THE UNITED STATES DISTRICT COURT
  FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KAREN Y. MARTIN,                    )
                                    )
         Plaintiff,                 )
                                    )
     v.                             )    1:05CV00343
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
         Defendant.                 )
```

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her claims for Social Security disability insurance benefits, a period of disability and supplemental security benefits. After an initial remand, the Commissioner's denial decision became final on March 23, 2005, when the Appeals Council found no basis for review of the hearing decision of the Administrative Law Judge (ALJ). Plaintiff has filed a motion for summary judgment, defendant has filed a motion for judgment on the pleadings, and the administrative record has been certified to the Court for review.

### The Plaintiff

Plaintiff, who was 39 years old at the time of her hearing in front of the ALJ, has a high school education with some college. Her past relevant work experience is as a cashier, production worker, inspector, and pharmacy technician. According to the ALJ, plaintiff alleged disability as of April 29, 2003, due to back pain, anxiety, depression, and carpal tunnel syndrome.

**Plaintiff's Issues**

Plaintiff has presented two issues to the Court for review. Initially, she contends that the ALJ erred in not following the specific admonition of the Appeals Council to evaluate the opinion of her treating physician. Next, she claims that the ALJ improperly assessed her mental residual functional capacity.

**Discussion**

In reaching a decision on plaintiff's claim, the ALJ followed the five-step analysis set out in the Commissioner's regulations. See 20 C.F.R. §§ 404.1520 and 416.920. Under the regulations, the ALJ is to consider whether a claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Id. The burden of persuasion is on the claimant through the fourth step. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). If the claimant reaches the fifth step, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education and work experience. Id.

The ALJ first found that plaintiff had not engaged in substantial gainful activity since the date of her alleged onset of disability (AOD). He then found that plaintiff suffered from the severe impairments of panic disorder with agoraphobia, depressive disorder, and sacroiliac joint dysfunction. The ALJ next decided

that plaintiff's severe impairments did not meet or medically equal the requirements of any listing in Appendix 1, Subpart P, Regulation Number 4.

The ALJ found that plaintiff had the residual functional capacity (RFC) to lift and/or carry up to 10 pounds occasionally; stand and/or walk for up to 2 hours in an 8-hour workday; sit for up to 6 hours each day; and handle the mental requirements of unskilled, routine, and repetitive work.  Based on this RFC, the ALJ concluded that plaintiff could not return to her past relevant employment.  However, based on the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations (hereinafter, the "Grids"), he found that plaintiff could perform jobs which existed in significant numbers in the national economy.  Accordingly, the ALJ ruled that plaintiff was not disabled within the meaning of the Social Security Act.

The scope of review by this Court of the Commissioner's decision denying benefits is limited.  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  The Court must review the entire record to determine whether the Commissioner has applied the correct legal standards and whether the Commissioner's findings are supported by substantial evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Where this is so, the Commissioner's findings are conclusive.  The Court may not reweigh conflicting evidence that is substantial in nature and may not try the case de novo.  Id.  The Court may not make credibility determinations or substitute its judgment for that of the ALJ.  Johnson v. Barnhart, 434 F.3d 650,

653 (4th Cir. 2005). "Substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (citation omitted), or "evidence which . . . consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted).

**Issue One**

Plaintiff's first issue for review is whether the ALJ erred in not following the directive of the Appeals Council to evaluate the opinion of her treating physician. It is for the ALJ and not the Court to assess the weight to be given medical opinions. The non-exclusive list of factors to be used include (1) whether the opinion is based on an examination, (2) the treatment relationship between plaintiff and the physician, (3) whether any evidence supports the opinion, and (4) the consistency of the opinion with other opinions and the evidence, and (5) whether the physician is a specialist. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005).

Although the opinions of treating physicians may be given controlling weight in making a determination of disability, they will not be given such weight if not supported by medically acceptable clinical and laboratory techniques or if they are not consistent with other substantial evidence in the record. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). A physician's opinion may

be discounted based on a number of factors, such as a relatively short treatment time, lack of independent evaluation, or undue reliance simply on plaintiff's statements in forming the opinion, etc. Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438 (4th Cir. 1997). Little weight may be accorded an opinion based mainly on plaintiff's subjective complaints. Johnson, 434 F.3d at 657; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). This is especially true with respect to psychological evaluations. Johnson, 434 F.3d at 657. Opinions finding medical problems may be discounted when supported by questionable tests, or are conclusory or based on scant supporting evidence. Id.

After the ALJ denied plaintiff's first disability application (Tr. at 51), she requested a review by the Appeals Council (Tr. at 85). By order dated October 31, 2003, the Council remanded plaintiff's case to the ALJ. (Tr. at 95) The Council noted that the ALJ had failed to "address the opinion of [plaintiff]'s treating physician, David O'Brien, Jr., M.D., who indicated in a report dated May 31, 2002, that [plaintiff] needs to avoid prolonged sitting and requires a job where she can alternate sitting and standing." (Id.) The Council instructed the ALJ to address this oversight upon remand.

Plaintiff claims the ALJ failed to do so in his subsequent decision with the consequence that he assessed her RFC incorrectly, failing to account for her inability "to sit for the period of time required to perform the full range of sedentary work." (Pl.'s Br. at 6) The Court concedes the ALJ failed to address the sitting

-5-

observation made by Dr. O'Brien on May 31, 2002, but finds no reason to remand the case on this basis.  Although plaintiff initially alleged an onset of disability of April 6, 2000 (see Tr. at 111), at her second hearing, she amended her AOD to April 29, 2003 (Tr. at 643).  During the period between Dr. O'Brien's May 2002 opinion and plaintiff's new AOD, new evidence arose which renders the sitting restriction irrelevant or moot.

On June 28, 2002, orthopaedist Vincent Paul examined plaintiff.  (See Tr. at 386)  He found that her exam on her toes revealed some pain exaggeration, but she was able to do it. Plaintiff's walk up on heels was normal, and her magnetic resonance imaging (MRI) unremarkable.  Dr. Paul opined that plaintiff's "work status" was "light/sedentary," and that she retained the capacity to stand and walk for 10 of 60 minutes, with no lifting, bending, or stooping, and a 5-pound weight restriction.  He did not restrict plaintiff's ability to sit.

After his May 2002 opinion, plaintiff did not return to Dr. O'Brien's office until August 2002, for a hip injection.  (See Tr. at 392)  In follow-up on August 26, she told the physician's assistant that she still had some slight lower back pain and muscle spasms, but that her hip pain had dissipated.  (Tr. at 391) Plaintiff wished to continue with her work restrictions, although her examination revealed no adverse findings.  She failed to show for a December 18, 2002 appointment with Dr. O'Brien.  (Tr. at 427)

Plaintiff did not see Dr. O'Brien again until March 5, 2003. (See Tr. at 427)  At that time, she explained that she came in

-6-

because she was out of Flexeril, which "really kept things functional for her." (Id.) Plaintiff returned on May 30, complaining of increased pain, although her exam was normal. (Tr. at 426) At that time, one month after her new AOD, Dr. O'Brien specified her work limitations as only "a 10 pound lifting restriction and to avoid bending and twisting activities." (Id.) When plaintiff next saw him on July 14, 2003, Dr. O'Brien remarked that "[s]he did not appear to be in as much pain as her questionnaire," and he found no clear etiology for her discomfort. (Tr. at 439)

Plaintiff underwent a second injection on August 7, 2003. (Tr. at 437) Upon follow-up on August 21, she saw Dr. Alexander Chasnis instead of Dr. O'Brien. (See Tr. at 435) Dr. Chasnis noted that plaintiff's June MRIs were negative. She appeared comfortable, in no apparent distress. Plaintiff had noted no focal extremity weakness, and her neurological exam was within normal limits, including a negative straight leg raise. She had 5 of 5 strength in her lower extremities, and her lumbar spine had guarded but full range of motion without any evidence of obvious weakness or clinical instability. (Tr. at 436) Dr. Chasnis concluded that plaintiff had mechanical low back pain, of "specific unknown etiology," and lumbar myofascial pain. (Id.) He referred her to a pain center.

Plaintiff's next back-related visit was to "The Rehab Center" for evaluation on October 24, 2003. (See Tr. at 477) The evaluator noted that MRIs of her lumbar spine and left hip were

negative. He found no gross muscular atrophy, plaintiff's strength to be 5 of 5 in both her upper and lower extremities, and her sensation intact to light touch and proprioception. (Tr. at 478) Plaintiff's straight leg raises were negative and her reflexes 2 of 4 in all extremities. Again, it was concluded that her pain was of uncertain etiology. (Tr. at 479) After a review of her 2003 medical records, a state agency physician determined that plaintiff would be able to perform "medium" work, including an unrestricted ability to sit for 6 hours in a 8-hour workday. (Tr. at 502)

Thereafter, plaintiff made regular visits to The Rehab Center, mostly under the care of Heather Fullerton, M.D., and John Begovich, D.O. These records, dated through August 3, 2004, do not show that her physical condition deteriorated. (See Tr. at 557-611) Significantly, a note dated March 4, 2004, states, "Per Greta at Dr. O'Brien's office *no work restrictions* or FCE[.]" (Tr. at 570 (emphasis added))

Because Dr. O'Brien's May 2002 opinion pre-dates the relevant period by almost a year, the Court finds no error in the ALJ not addressing it, notwithstanding the Appeals Council's instructions, which were given prior to plaintiff's change of AOD. Moreover, the Court finds the May 2002 opinion inconsistent with the later medical records and opinions in the transcript.

**Issue Two**

The next issue raised by plaintiff is that the ALJ failed to evaluate her mental RFC in accordance with Social Security protocol, specifically, that he "did not include in the decision a

-8-

discussion of plaintiff's ability to engage in the various work-related mental activities." (Pl.'s Br. at 8) However, there is no requirement found in plaintiff's citations to Social Security Rulings that an adjudicator set forth in his decision a discussion of work-related mental activities. Cf. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

The ALJ rejected plaintiff's claims of disability based on mental problems with the following discussion:

> The claimant's change of onset date coincides with the date that she started treatment at Centerpoint, indicating that she wishes to assert that she is disabled due to mental impairment. This is not a very persuasive argument. For one thing, she was advised to see a psychiatrist in May 2002, but did not actually consult one for almost a year. She did so then only on the urging of her attorney. This is not a likely response if her emotional status was as fragile as she would have one believe. Moreover, once she consulted the staff at Centerpoint, she was never diagnosed with major depression, but with adjustment disorder with depressed mood. More recently she has shown the signs of panic disorder, but there is no evidence that this condition can be expect [sic] to last for twelve continuous months. She has responded well to psychotropic medication for her adjustment disorder, and can be expected to do so for the panic disorder. However, even with the panic attacks, which objective evidence shows happen somewhat infrequently, the claimant is able to care for her family and herself, drive and shop, and interact with her family. In short, there is nothing in the record to show that panic attacks are either so frequent or of a severity to preclude work activity. Moreover, the file reflects that the claimant believes that she can work, but just has not been able to obtain the kind of reduced activity work of which she is capable.

(Tr. at 24)

-9-

Plaintiff cites to Social Security Ruling (SSR) 96-8p, 61 Fed. Reg. 34474-01, for the proposition that "[t]he psychiatric review technique . . . requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings." Id. at 34477. This the ALJ did in the decision. In addressing the "paragraph B" criteria, the ALJ explained, "[T]he file reflects only moderate limitations on her activities of daily living and social functioning. There is no evidence of limitations on concentration, persistence or pace . . . . Finally, there is no evidence in the file of episodes of decompensation[.]" (Tr. at 22) The ALJ's consideration of the "paragraph C" criteria is evident in the passage quoted above. (See Tr. at 24) The ALJ added that plaintiff conversed freely in her group sessions. (Tr. at 22)

Plaintiff further asserts that "the ALJ appears to have concluded that plaintiff's mental impairments, despite being severe, result in no work-related mental impairments." (Pl.'s Br. at 8) The Court finds this statement somewhat disingenuous; as discussed above, the ALJ found that she suffered moderate limitations on her activities of daily living and social functioning. Additionally, although he found that plaintiff had more than a high school education and past employment that included work as a pharmacy technician, the ALJ restricted her RFC to "the mental requirements of unskilled, routine and repetitive work." (Tr. at 26)

-10-

Plaintiff notes that no caregiver ever stated that her symptoms were under control, yet none ever opined that her mental condition prevented her from working. Cf. Stuckey v. Sullivan, 881 F.2d 506, 509 (7th Cir. 1989) (a claimant's inability to work pain-free is not sufficient reason to support a finding of disability); Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir. 1988) (same); Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983) (same). As discussed by the ALJ, plaintiff did not seek mental health treatment, at CenterPoint Human Services, until April 29, 2003. (See Tr. at 24, 489) She started attending group therapy the following month. (See Tr. at 485) However, after a medication evaluation on May 29 (Tr. at 484), there is no record that she returned to CenterPoint until October 6, 2003 (see Tr. at 483).

Plaintiff had her second medication evaluation a week later (see Tr. at 482), and attended a third group session two weeks later, on October 27, 2003 (see Tr. at 481), but did not return to group until December 8 (see Tr. at 555). Yet after only 4 group sessions and 2 medication evaluations over a 7-month period, plaintiff claimed that she was "definitely better." (Id.)

Plaintiff next attended group therapy in mid-January 2004 (see Tr. at 554), and had her third medication evaluation on March 5 (see Tr. at 553) – an almost 5-month interval between evaluations. The doctor, Katherine Marshall, made significant changes in her medication regimen. When she returned to Dr. Marshall some 6 weeks later, plaintiff reported that the medications were "doing pretty

-11-

well," her panic attacks were "pretty much controlled," and she had stopped going to group. (Tr. at 549)

The doctor noted that plaintiff was pleasant and cooperative, and conversed easily. Her mood was improved, her affect was broad and appropriate, and her judgment and insight were intact. Dr. Marshall concluded that plaintiff was "essentially stable" and "coping," although "[s]he might be given to increased anxiety and panic during times of increased stress." (Tr. at 550) At plaintiff's next CenterPoint visit, she was experiencing anxiety, frustration, and some depression, but Dr. Marshall found no obvious signs of panic or severe anxiety. (Tr. at 545) The doctor recorded no reservations to plaintiff's consideration of a move to Arizona.

During the early part of this period, and in September 2003, plaintiff underwent a psychological consultative examination by Dr. Richard Spencer. (See Tr. at 441) He noted that plaintiff drove herself, and came alone. Her attitude and degree of cooperation were good, and she related well to the staff and to the doctor. Plaintiff told Dr. Spencer that she made a point to leave the house daily, although she did not go to "'big places,'" because after 30 minutes, she is "'hurting really bad.'" (Tr. at 445)

A mental status examination revealed good eye contact, with a normal and responsive face. (Tr. at 446) The quantity and quality of plaintiff's speech were normal, her affect appropriate, her mood pleasant. Plaintiff was alert and cooperative, and her thought processes were logical and coherent. Her attention and

-12-

concentration appeared normal, although Dr. Spencer found her judgment impaired.

Dr. Spencer noted plaintiff's ability to understand instructions during the assessment was good, although he judged her adjustments in personal, social, and occupational areas to be poor. (Tr. at 447)  Subsequent to this examination and a review of plaintiff's records, a state expert, Dr. Jeffrey Wysocki, determined that plaintiff retained the ability to function in a work setting with limited demands for productivity.  (Tr. at 511)

Plaintiff complains the ALJ failed to address Dr. Spencer's opinion on her limitations, but the Court finds such omission to be harmless.  First, Dr. Spencer did not specify what, if any, "limitations" would result from plaintiff's poor adjustment ability.  Also, as noted by the ALJ, in group therapy plaintiff was open to discussing her health and family issues and to helping others with similar problems. (Tr. at 21)  She even went online to "chat" with others about pain issues.  (See Tr. at 22)

Plaintiff herself reported to Dr. Spencer that she worked moderately and steadily, had never had problems relating to bosses and co-workers, and never felt stress on the job.  (Tr. at 447) The ALJ further noted that plaintiff was able to care for herself and her two children, although limited by her physical impairment. (Tr. at 22)  These observations, together with the opinion of Dr. Wysocki, provide substantial evidence to support the ALJ's finding.

Plaintiff last argues the ALJ failed to cite to Dr. Wysocki's September 2003 conclusion that she could work "*only* in a non-

-13-

production work setting" that did "not involve extensive social interaction." (Pl.'s Br. at 10 (citing Tr. at 511))  Again, the Court must concede the omission, but plaintiff's phrasing of the doctor's recommendations alters its meaning.  Dr. Wysocki opined that plaintiff "*should* be able to perform simple routine tasks at a non-productive pace" (Tr. at 511 (emphasis added)); he did not state that she necessarily could work *only* under such conditions. Perhaps more important, Dr. Wysocki's limitations were based on his opinion that plaintiff's concentration and attention were impaired which, as noted above, Dr. Spencer found to be normal.  The ALJ resolves the conflicts in the evidence, not this Court.

During the consultative examination, Dr. Spencer asked plaintiff about pacing herself in a work situation.  (Tr. at 447) She responded, "I liked to be motivated.  I work moderately and steadily.  I loved my job."  (Id.)  Plaintiff added that she "'never felt stress'" in a work setting.  (Id.)  Considering these statements, the Court is persuaded that plaintiff suffered no harm by the ALJ not specifically addressing Dr. Wysocki's limitation or all of Dr. Spencer's comments.  Cf. Morris v. Bowen, 864 F.2d 333, 336 (5th Cir. 1988) ("[E]ven if such an impropriety exists, it does not render the ALJ's determination unsupported by substantial evidence, and thus does not prejudice Morris's substantive rights.").

As to plaintiff's alleged social isolation, as discussed above, plaintiff easily and readily related to others in her group therapy sessions, and communicated with total strangers online.

-14-

Dr. Spencer even noted that plaintiff related well to him and to his staff – also strangers to her. Further, as explained by the Seventh Circuit by reference to the Grids:

> [T]he regulations dealing with sedentary work provide that there are approximately two hundred separate unskilled sedentary occupations in the national economy. [Grids, Section 201.00(a).] Of these two hundred, approximately eighty-five percent of these jobs are in the machine trades and bench work occupational categories that would not require a high degree of interaction with others.

Zalewski v. Heckler, 760 F.2d 160, 165 (7th Cir. 1985) (footnote omitted).[1] Accordingly, the ALJ's reliance on Rule 201.27[2] of the Grids is not affected by a public-interaction limitation, and the Court finds no reversible error on this basis.

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for summary judgment (docket no. 12) be denied, that defendant's motion

---

[1]The Court added:

> The regulations give further indication that not all sedentary jobs entail a high degree of interaction with others. For example, in referring to such impairments as illiteracy or the inability to communicate in English, the regulations note that such impairments would have little significance for work functions at the unskilled level because such work functions relate to working with things rather than with data or people. [The Grids, § 201.00(i).] The regulation concludes by stating that "the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English."

Zalewski v. Heckler, 760 F.2d 160, 165 n.5 (7th Cir. 1985).

[2]Rule 201.27 directs a finding of "not disabled" where the claimant has a maximum capacity for sedentary work, is a younger individual (age 18-44), is at least a high school graduate, and is unskilled.

to affirm the decision of the Commissioner (docket no. 16) be granted, and that Judgment be entered dismissing this action.

                                          /s/ Russell A. Eliason
                                    **United States Magistrate Judge**

August 29, 2006

-16-

Case 1:05-cv-00343-JAB-RAE   Document 17   Filed 08/29/06   Page 16 of 16